UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CORNELIUS MYLES BY HIS NEXT
FRIEND AND MOTHER AKEYA
GREGORY,

      Plaintiff,

v.

INKSTER POLICE CHIEF GASKIN, ET AL,

      Defendants.
_____/

Case No. 09-13438

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [21]**

This action, alleging Fourth Amendment violations and municipal liability,[1] is brought pursuant to 42 U.S.C. § 1983. It arises from an incident that occurred in the afternoon of June 10, 2009. Plaintiff Cornelius Myles[2] alleges that Defendant Inkster Police Chief Gaskin and Defendant Inkster Police Auxiliary Chief Ratlif violated his Fourth Amendment rights by unreasonably seizing and searching him on June 10, 2009 and by using excessive force during that seizure. Plaintiff's claim of municipal liability against Defendant City of Inkster alleges that the City has policies that are affirmatively linked to the Defendant Officers' alleged unreasonable search and seizure and use of excessive force on June 10, 2009.

---

[1]After removal, Plaintiff's state law claims were remanded to state court [4].

[2]Plaintiff Cornelius Myles is a minor, and this action was filed by his mother on his behalf. Plaintiff is used here to refer to Cornelius Myles.

This matter is now before the Court on Defendants' motion for summary judgment arguing that there were no Fourth Amendment violations, Defendant Officers are entitled to qualified immunity on Plaintiff's Fourth Amendment claims, and Plaintiff cannot assert a claim of municipal liability against Defendant City of Inkster. As discussed below, Defendants' motion is GRANTED as to Plaintiff's claim of excessive force against Defendant Ratlif, is GRANTED as to some but not all of Plaintiff's claims of municipal liability, and is DENIED as to all remaining claims.

## I. Facts

In the early afternoon on the last day of the school year, June 10, 2010, Plaintiff Cornelius Myles, who was 17 years old, was walking from Inkster High School to the Big 4 Cab Company in Inkster – a business owned by Plaintiff's family. (Pl.'s Dep. at 7, 10, 17.) Tanaya Williams, Plaintiff's 15-year-old aunt, walked with him. A cousin, 15-year-old Gerald Nelson, rode his bike alongside them. The three teens were walking on Middlebelt crossing the intersection at Avondale. (Ratlif Dep. at 24.) Plaintiff testified that his cousin Gerald was singing a "Lil' Wayne" and Bobby Valentino song titled "Mr. Officer." Tanaya testified that she was dancing and the kids were "bouncing" or waiving their hands in the air as Gerald sang. (T. Williams Dep. at 9-11.)

An unmarked police car with Defendant Officers in it passed the three just when Gerald was singing a verse of the lyrics, "And all she want me to do is fuck the police," loud enough for Defendants to hear. (*Id.* at 21-22; G. Nelson Dep. at 10.) The unmarked police car turned around and parked right by a gas station at Avondale and Middlebelt. Plaintiff, Tanaya and Gerald did not know the two men in the car were police because it was an unmarked car and they were not in uniform. (Pl.'s Dep. at 23; T. Williams Dep. at 10; G.

2

Nelson Dep. at 11.) Chief Gaskin testified that no other people in cars or patrons in the gas station seemed to notice the three teens until after Defendants stopped them and they had Plaintiff and his cousin Gerald face down on the trunk of the unmarked police car. (Gaskin Dep. at 53-58.)

Viewing the facts in the light most favorable to Plaintiff, Police Chief Gaskin jumped out of the car and grabbed him, telling him at that time that he was the Chief of Police. (Pl.'s Dep. at 23-24.) Chief Gaskin asked the three why they were not in school, and they replied that it was the last day of school and they got out early. (Gaskin Dep. at 15.) Plaintiff told Chief Gaskin that they "didn't do nothing" and his cousin Gerald pleaded with Defendant Officers asking "please, what did we do?" (Pl.'s Dep. at 23.) Police Chief Gaskin grabbed Plaintiff's right arm with his right hand, then grabbed his neck with his left hand and forced him, head first, face down, on the trunk of the unmarked police car. (Pl.'s Dep. at 23.) Chief Gaskin said that he heard what they had said -- that they wanted to fuck the police. (Pl.'s Dep. at 26.) Gerald admitted that he said "fuck the police," but explained that he was singing a song and was not shouting the words at the police or about the police; "it wasn't meant that way." (Pl.'s Dep. at 23.)

As Auxiliary Police Chief Ratlif patted-down Plaintiff, Chief Gaskin focused his attention on Gerald, grabbing him and forcing his head to the back of the trunk. (Pl.'s Dep. at 25-26.) Defendant Ratlif testified that both he and Defendant Gaskin did a pat-down on Plaintiff. (Ratlif Dep. at 36-38.) Defendant Gaskin admits that he conducted a pat-down on Plaintiff. (Gaskin Dep. at 20-21.)

After the pat-down, Plaintiff still had his arms spread with his hands and head on the back of the trunk. He told Defendants that he didn't have any drugs or weapons and asked

3

what they were holding him for.  Plaintiff repeated that he did not do anything; that Gerald had just admitted that it was Gerald and not Plaintiff that said "fuck the police."  (Pl.'s Dep. at 28.) Chief Gaskin responded, "oh, you want to talk smart?"  (Pl.'s Dep. at 26-27.)  Gaskin told Plaintiff to "shut up."  He grabbed Plaintiff again by the back of the neck and threw his head against the trunk.  (*Id.* at 27-28.)  Every time Plaintiff talked, it just made Chief Gaskin madder.  (Pl.'s Dep. at 28-29.)  While he was face-down on the trunk, Police Chief Gaskin told Plaintiff that "he's not a new officer on the force, that he beats kids," that "he's old school," and "he don't have a problem with putting his hands on [another] person's kids."  His partner, Auxiliary Police Chief Ratlif, told Plaintiff, "if this was 20 years ago your head would probably be in the back of the windshield."  (Pl.'s Dep. at 28-29.)

Then, while still face-down on the trunk of the car and with Chief Gaskin still holding him, Plaintiff lifted his head to tell Tanaya to call his mother.  Defendants told Tanaya to get away from the scene or she would get handcuffed.  (Pl.'s Dep. at 30, 34.)  Defendants had handcuffed Gerald and put him in the back of the another police vehicle that was on the scene.  (Pl.'s Dep. at 34, 37.)  Defendants had called for backup, and backup officers were now present.

During this time, Chief Gaskin was telling Plaintiff that he can't go around yelling "fuck the police;" that it's disorderly conduct.  (Pl.'s Dep. at 34.)  Plaintiff kept telling Chief Gaskin that he had done nothing wrong, that Gerald admitted that it was he who said "fuck the police," and kept asking why they would not let him go.  Each time Plaintiff moved his head to the side to attempt to talk, Chief Gaskin forced his head, forehead down, onto the trunk of the car and told him to be quiet.  Plaintiff claims that Chief Gaskin slammed his head onto the trunk three or four times; that he used force aggressively by placing his hands on

4

the back of Plaintiff's neck in a way that choked him, prevented him from moving his neck, and caused him to gasp for breath. Chief Gaskin never put him in handcuffs, never read him his rights, but kept throwing his head against the trunk of the car in this aggressive manner. (Pl.'s Dep. at 30, 32-34, 38-39.) When Chief Gaskin asked for Plaintiff's ID, he attempted to provide it to him, but Chief Gaskin pulled it out of his pocket because Plaintiff was still face-down on the trunk of the car. (Pl.'s Dep. at 35.)

Then, Gerald's mother arrived on the scene. One of the cab drivers from the family's cab company was at the gas station, saw what was going on, and went and got Gerald's mother and brought her to them. (Pl.'s Dep. at 36.) Gerald's mother and Chief Gaskin carried on a conversation at the front of the car while Plaintiff was ordered by Ratlif not to move from the trunk of the car. (Pl.'s Dep. at 37.) Plaintiff could hear Gerald's mother tell Chief Gaskin that he and Gerald were both good boys and don't get into trouble. Chief Gaskin told Gerald's mother than he wanted Gerald to apologize for his actions and then he would let him go free. Gerald was allowed out of the back seat and was no longer handcuffed as Chief Gaskin explained why he though his comments were wrong and disrespectful. After the police let Gerald go, Chief Gaskin came to the back of the car and told Plaintiff that he could leave. All the police cars left at that time. The entire incident took about 20 to 25 minutes. (Pl.'s Dep. at 37-39.)

Another Inkster Police Officer, John Hankins, responded to a call for backup and was on the scene. He testified that he saw Plaintiff laying on the trunk of an unmarked police car with Chief Gaskin next to him and Gerald in the back seat of a Ford Expedition police car. (Hankins Dep. at 10.) Hankins heard Gaskin cussing and swearing at Plaintiff, saying "You think you can talk to the fuckin' police anyway you want to?" (Hankins Dep. at 23.)

5

He did not see any physical contact between Gaskin and Plaintiff. (Hankins Dep. at 22.) He did not see either Plaintiff or Gerald doing anything to excite a crowd of people or cause a disturbance. (Hankins Dep. at 19.)

Plaintiff's mother arrived after the police had left. Plaintiff, his mother, and other family members went to the Inkster Police Department to make a citizen's complaint about Defendants. Plaintiff testified that Sergeant Davidson refused to give his mother the paper work for filing a complaint and told them that her boss told her not to give it to them. (Pl.'s Dep. at 45-46.) Chief Gaskin admits that he received a call from Sergeant Davidson at the Inkster Police Department advising him that Plaintiff's mother was at the station attempting to make a complaint about his conduct. He also claims that he told Sergeant Davidson to take the complaint, knows that she did not do so, but never talked to her about it or asked her why she did not take the complaint. (Gaskin Dep. at 39-41.)

After the incident, Officer Hankins was at the Inkster Police station when Plaintiff's mother came in to file a complaint about Chief Gaskin's treatment of her son. Hankins overheard Sergeant Davidson in the front lobby of the Inkster Police station tell Plaintiff's family that they would have to go to City Hall if they wanted to make a complaint against Chief Gaskin; that she wasn't going to take a complaint on him. Later, Sergeant Davidson confirmed to Hankins that Plaintiff's family wanted to make a complaint against Chief Gaskin and she told them to go to City Hall. (Hankins Dep. at 15-16.)

Immediately after overhearing this conversation between Sergeant Davidson and Plaintiff's family, Officer Hankins saw Gaskin in the police department parking lot. Chief Gaskin got out of his car and approached Hankins and another officer. He was talking to them about the incident with Plaintiff. Hankins then told Gaskin that Plaintiff's family was

6

just in the station talking with Sergeant Davidson. Chief Gaskin then told Hankins that "I tuned that little mother fucker up, bounced his head off the trunk a couple of times." (Hankins Dep. at 16-17.) Hankins reported this statement to his immediate supervisors but did not prepare a written report about it. (Hankins Dep. at 18, 25-26.) Hankins was terminated on July 7, 2009 and has a lawsuit pending against Chief Gaskin and others alleging that he was terminated in retaliation for reporting Gaskin's comment about how he treated Plaintiff. (Hankins Dep. at 29-32.)

Plaintiff's mother apparently went to City Hall and made a complaint against Chief Gaskin. (Pl.'s Ex. F, citizen complt. time stamped rec'd by City Clerk, Inkster on 6/10/09 at 3:18 p.m.) The City Manager, Ann Capela called Chief Gaskin over to City Hall to discuss this citizen complaint. (Gaskin Dep. at 42-43.) Chief Gaskin testified that citizen's complaints are investigated by the City Manager. (Gaskin Dep. at 42.) The City Manager called the minor Plaintiff at his home to discuss the complaint while Chief Gaskin was in her office and apparently listening to the conversation. (Gaskin Dep. at 43.) Plaintiff testified that, while he was on the phone with the City Manager, Chief Gaskin began to speak. He tried to set up a meeting with Plaintiff without his parents, telling Plaintiff that he was almost 18. Plaintiff told Chief Gaskin he was not willing to do that and his parents then took the phone away from him. (Pl.'s Dep. at 47-48.) There is no evidence that the City Manager made any further attempts to contact Plaintiff's mother about her complaint prior to August 12, 2009 when she filed this lawsuit on Plaintiff's behalf.

Immediately after the incident, Plaintiff told his mother that his head was hurting bad. She took him to the Garden City Hospital emergency room after trying to make a citizen's complaint at the police station. The hospital took x-rays, performed a CAT scan, and

7

diagnosed him with a closed-head injury and a sprained cervical. They prescribed medication. Plaintiff also went to the family doctor two times for recurring headaches and neck muscle spasms and was prescribed medication. (Pl.'s Dep. at 43, 47, 51-52, 55.)

No charges were ever filed against Plaintiff or his cousin, and Chief Gaskin never filed a police report about the June 10, 2009 incident. (Gaskin Dep. at 24.)

## II. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A moving party may meet that burden "by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). When the moving party has met its burden under rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002).

## III. Analysis

Defendants move for summary judgment arguing that (1) Defendants are entitled to qualified immunity on Plaintiff's Fourth Amendment claims; (2) probable cause existed for the stop, detention, and pat-down of Plaintiff under Michigan's truancy statute, Mich. Comp.

Laws § 380.1561, and under Inkster's Disorderly Conduct Ordinance, § 131.01(B)(10)[3]; (3) the force used on Plaintiff was reasonable under the circumstances because Plaintiff was refusing to cooperate with Defendant Officers while being patted-down, questioned, and detained; and (4) Plaintiff cannot establish an affirmative link between any City of Inkster policy and his injuries and thus cannot establish municipal liability.  The Court begins its analysis with Defendants' qualified immunity arguments.

### A. Qualified Immunity

In a recent decision, the Sixth Circuit addressed qualified immunity in the context of a § 1983 excessive force case.  *See Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009).  It began, as this Court does, with a discussion of the doctrine of qualified immunity and how the Court determines whether a defendant is entitled to the protection afforded by that doctrine.

The doctrine of qualified immunity shields "'government officials performing discretionary functions'" from "'liability for civil damages insofar as their conduct does not

---

[3]This Ordinance provides that:

> (A)  Any person found guilty of the following offenses in the city shall be deemed a disorderly person and punished as in this code provided.
>
> (B)  The following offenses shall be, but are not limited to:
>
> * * *
>
> (10)  Any person who shall make or assist in making any noise, disturbance, trouble or improper diversion or any rout or riot, by which the peace and good order of the city are disturbed.

Inkster Ord. § 131.01(A), (B)(10).

9

violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 309 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). On summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party; Plaintiff in this case. Viewing the facts in that light, the Court must then determine "whether: 1) the violation of a constitutional right has occurred; and 2) the constitutional right at issue 'was clearly established at the time of defendant's alleged misconduct.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), and citing *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004)). Although the Supreme Court, in *Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808, 818 (2009), recently held that the courts now have discretion to address the second step first when appropriate, this Court, similar to the Sixth Circuit in *Grawey v. Drury*, will first examine whether Plaintiff has presented evidence of a constitutional violation. *Grawey*, 567 F.3d at 309.

**1. Reasonable Suspicion for Stop**

The parties do not dispute that Defendant Officers' encounter with Plaintiff on June 10, 2009 was a stop that falls within the ambit of the Fourth Amendment. Similar to a disputed issue in *King v. City of Eastpointe*, 86 F. App'x 790, 805 (6th Cir. 2003), and *Bennett v. City of Eastpointe*, 410 F.3d 810, 821 (6th Cir. 2005), the parties here dispute "whether there was reasonable suspicion for the stop and whether the subsequent investigatory methods used were reasonable under the circumstances." *Bennett*, 410 F.3d at 821. The analysis in *Bennett* and *King* applies here.

To evaluate whether there was reasonable suspicion for the stop, the court examines "'whether there was a proper basis for the stop, which is judged by examining whether the

law enforcement officials were aware of specific and articulable facts which gave rise to a reasonable suspicion.'" *King*, 86 F. App'x at 805 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). Similar to the Sixth Circuit's decision in *King*, this Court concludes that Defendant Officers "had reasonable suspicion to conduct an investigatory stop solely on the grounds that [Plaintiff and his companions] were truant from school." *Id.* Defendant Officers identified truancy as a reason for the stop. The *King* court explained that "Michigan has a compulsory education law, which penalizes nonattendance and truancy." *Id.* at 805, n.6 (citing Mich. Comp. Laws §§ 380.1561; 380.1599). It then observed that "the Michigan Court of Appeals found that Michigan's abovementioned compulsory education law binds children, as well as their parents, and in so holding the court opened the way for a lower juvenile court to hold that the child concerned in the case was a juvenile delinquent due to her truancy." *Id.* Accordingly, Defendant Officers' initiation of the stop was justified and did not violate the Fourth Amendment.[4] Defendants are entitled to summary judgment on this claim.

**2. Reasonable Suspicion for Plaintiff's Pat-Down Search and Detention**

The Court now addresses "whether the subsequent detention and intrusion was reasonably related to the scope of the stop." *Bennett*, 410 F.3d at 821 (citing *Terry*, 392

---

[4]In light of this decision, it is not necessary to examine whether there was a reasonable suspicion to conduct an investigatory stop on the grounds that Plaintiff had violated the City of Inkster's disorderly conduct ordinance. Plaintiff argues that the Inkster ordinance is unconstitutional because it infringes on his First Amendment rights of free speech. As the Michigan Court of Appeals observed in *City of Detroit v. Bernal*, No. 196994, 1998 WL 1990404, *1 (Mich. Ct. App. Aug. 4, 1998) (internal citation omitted), "a court does not grapple with a constitutional issue except as a last resort." Thus, because there is another ground on which this issue may be disposed of, "a broad constitutional challenge should not be considered." *Id.*

U.S. at 17-19). Viewing the facts in the light most favorable to Plaintiff, Defendant Officers' conduct after the stop violated the Fourth Amendment. When Chief Gaskin asked why Plaintiff and his companions were not in school, they responded that it was the last day of school and they got out early. Defendant Officers made no attempt to verify this information. When Chief Gaskin focused on Plaintiff and accused him of yelling "fuck the police," Gerald immediately informed him that he sang those words and not Plaintiff. Nonetheless, after obtaining this information, Plaintiff was forcibly held face down on the trunk of the unmarked police car and subjected to a pat-down search by both Defendants. As the Sixth Circuit observed in *Bennett*, "[a] lawful stop does not necessarily carry with it the authority to conduct a pat-down search." *Bennett*, 410 F.3d at 822. "To justify a pat-down search, the officers must articulate specific facts that would warrant 'a reasonably prudent man in the circumstances . . . . in the belief that his safety or that of others was in danger.'" *Id.* (quoting *Terry*, 392 U.S. at 27).

Both Defendant Officers testified that they each conducted a pat-down search of Plaintiff for safety reasons. (Ratlif Dep. at 37-38, 49; Gaskin Dep. at 20-21.) Other than providing the reasons for the initial stop -- truancy and suspicion of violating the City of Inkster Ordinance prohibiting disorderly conduct -- Defendant Officers provide no facts "that would create a reasonable suspicion that [Plaintiff] was armed and dangerous." *Bennett*, 480 F.3d at 824. "The mere fact that an officer has the *authority* to arrest an individual does not and never has, automatically permitted the officer to conduct a pat-down search should he choose *not* to effectuate the arrest." *Id.* "For an officer to conduct a search incident to arrest, there must be an *actual arrest*. Otherwise, unless the officer points to

specific facts that demonstrate reasonable suspicion that the individual is armed and dangerous, the Fourth Amendment tolerates no frisk." *Id.* Even assuming *arguendo* that a pat-down was permissible, Chief Gaskin's continued physical detention of Plaintiff, as described by Plaintiff, would violate the Fourth Amendment. Accordingly, viewing the facts in the light most favorable to Plaintiff, summary judgment is inappropriate because there remains a genuine issue of material fact on Plaintiff's Fourth Amendment claim "based on the unreasonableness of the pat-down search and the intrusion during the stop." *Bennett*, 410 F.3d at 823. Moreover, Defendant Officers are not entitled to qualified immunity. Considering the above decisions and viewing the facts in favor of Plaintiff, the pat-down search would be unreasonable under the Fourth Amendment and would not be an objectively reasonable search by a police officer. *See King*, 86 F. App'x at 807; *see also Bennett*, 410 F.3d at 823.

The Court now addresses whether summary judgment should be granted on Plaintiff's Fourth Amendment claim alleging excessive force against both Defendant Officers.

### 2. Excessive Force

First, the Court finds that Plaintiff's failure to provide any facts or evidence supporting his claim of excessive force against Defendant Ratlif warrants dismissal of that claim. Accordingly, Defendants' motion on this claim against Defendant Ratlif is granted. The Court now addresses Plaintiff's excessive force claim against Defendant Gaskin.

The Court's task is to evaluate Defendant Gaskin's conduct "under the Fourth Amendment's 'objective reasonableness' standard." *Roberts v. Manigold*, 240 F. App'x 675, 677 (6th Cir. 2007) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004)). Under

the Fourth Amendment, a police officer may use only such force as is objectively reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Determining whether there has been a Fourth Amendment violation requires consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. "The Court should judge the lawfulness of the conduct from the 'perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight.'" *Morrison v. Bd. of Tr. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (quoting *Graham*, 490 U.S. at 396).

Viewing the facts in the light most favorable to Plaintiff, and applying the above three *Graham* factors, Defendant Gaskin's physical contact with Plaintiff was not objectively reasonable. First, both truancy and violation of the City of Inkster Ordinance for disorderly conduct are not serious offenses. Second, Defendants present no facts showing that Plaintiff was an immediate threat to the safety of the officers or others. Finally, Plaintiff testifies that he was not actively resisting arrest. Rather, he testified that Chief Gaskin never told him that he was under arrest yet continued to forcibly hold him face down on the back of his unmarked police car. When Plaintiff asked what he did wrong and tried to explain that he did not yell "fuck the police" and wanted to know why he was being held, Chief Gaskin slammed his head onto the trunk and told him to "shut up." Viewing the facts in Plaintiff's favor, a reasonable officer on the scene would not conclude that Plaintiff posed an immediate threat to the safety of the officer or others or that Plaintiff was actively resisting arrest or attempting to evade arrest by flight. It is objectively unreasonable to use

14

physical force on a person under these facts. *See Grawley*, 567 F.3d at 311 (holding that an officer uses "excessive force when he pepper sprays a suspect who has not been told she is under arrest and is not resisting arrest.").

Taking the evidence in the light most favorable to Plaintiff but viewing it from the perspective of a reasonable officer on the scene, Plaintiff's evidence establishes an excessive force claim against Defendant Gaskin. Moreover, in light of the decisions discussed above, Plaintiff also satisfies the second step of the qualified immunity analysis by showing that his Fourth Amendment rights were clearly established at the time of Chief Gaskin's physical contact. "[T]here need not be a case with the exact same fact pattern or even fundamentally similar or materially similar facts; rather, the question is whether the defendants had fair warning that their actions were unconstitutional." *Grawey*, 567 F.3d at 313-14 (internal quotations marks and citations omitted). Accordingly, Defendant Gaskin is not entitled to qualified immunity on this claim, and the motion for summary judgment on Plaintiff's Fourth Amendment claim of excessive force against Defendant Gaskin is denied. Material issues of fact remain for trial on Plaintiff's excessive force claim.

**B. Municipal Liability**

It is well-established that "[a] municipality, like a supervisor, may not be held liable under section 1983, simply upon the theory of *respondeat superior*." *Bennett*, 410 F.3d at 818. "A municipality may be held liable only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* (internal quotation marks and citation omitted). "Furthermore, for municipal liability, there must be an 'affirmative link between

15

the policy and the particular constitutional violation alleged.'" *Id.* (quoting *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)). "The claimant has the burden of proof of establishing the existence of an unconstitutional policy and demonstrating the link between the policy and the alleged injuries at issue." *Id.*

Defendants' motion for summary judgment on Plaintiff's claims of municipal liability succeeds in part and fails in part. First, as discussed above, Plaintiff has failed to establish that Defendant Officers violated his Fourth Amendment rights by initiating a *Terry* stop based on a reasonable suspicion that Plaintiff and his companions were violating Michigan's truancy laws. Thus, Defendant City of Inkster cannot be held liable on this theory of municipal liability. Second, Plaintiff also fails to provide any evidence of an unconstitutional municipal policy that is affirmatively linked to Defendant Officers' pat-down search and detention of him beyond the initial stop. Accordingly, Defendants are also entitled to summary judgment on this theory of municipal liability.

Despite Defendants' success on the above, Defendants are not entitled to summary judgment on Plaintiff's claim of municipal liability based upon the City's failure to adequately investigate claims of Defendant Gaskin's unreasonable use of force. Plaintiff presents evidence that the City was aware of a prior incident where Chief Gaskin allegedly used excessive force. Officer Hankins testified that in mid-May 2009, Chief Gaskin assaulted a gentleman in lockup, there was a video of the incident, and individuals in the Inkster Police Department had reviewed the video and had discussed it. (Hankins' Dep. at 19-20.) Plaintiff also presented evidence that would support an allegation that the City had a policy of discouraging citizen's complaints or minimizing the seriousness of complaints about

16

Chief Gaskin's use of unreasonable force. A municipality's failure to investigate constitutional deprivations and to discipline offending officers appropriately can ratify the misconduct, giving rise to municipal liability under 42 U.S.C. § 1983. *See, e.g., Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985). But to make out such a claim, "the plaintiff 'must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.'" *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (quoting *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997)); *see also McClendon v. City of Detroit*, 255 F. App'x 980, 983 (6th Cir. 2007) (applying "deliberate indifference" standard to ratification claim); *Black v. City of Memphis*, No. 98-6508, 2000 WL 687683, *3-4 (6th Cir. May 19, 2000) (same).

The Sixth Circuit has held that, "[t]o establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training [or supervision or discipline] in this particular area was deficient and likely to cause injury." *Miller v. Sanilac County*, 606 F.3d 240, 255 (6th Cir. 2010) (internal quotation marks and citation omitted). Plaintiff has presented evidence supporting a claim that the Defendant City had prior notice of Chief Gaskin's unconstitutional conduct and failed to adequately investigate or address that unconstitutional conduct. Accordingly, a genuine issue of material fact exists for trial on the claim that the City of Inkster had a policy or practice of inadequately investigating or otherwise ratifying Chief Gaskin's use of excessive force. Defendants' motion for summary judgment on this claim of municipal liability is thus denied.

**IV. Conclusion**

For the above-stated reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Defendants' motion is GRANTED as to Plaintiff's claim of excessive force against Defendant Ratlif, is GRANTED as to some but not all of Plaintiff's claims of municipal liability, and is DENIED as to all remaining claims.

        s/Nancy G. Edmunds
        Nancy G. Edmunds
        United States District Judge

Dated: October 12, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 12, 2010, by electronic and/or ordinary mail.

        s/Carol A. Hemeyer
        Case Manager